# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

Kima Hamilton,

    Plaintiff,

    v.

Delta Air Lines, Inc.,

    Defendant.

Case No. 17-cv-1725

# COMPLAINT

### I. NATURE OF ACTION

101. This is a civil action brought by the Plaintiff in order to obtain compensation for the violation of rights secured to him by the Civil Rights Act of 1866, 42 U.S.C. Sec. 1981, which occurred when the Defendant airline discriminated against him on the basis of race.

### II. JURISDICTION AND VENUE

    **A. Jurisdiction**

201. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343(a)(4) (federal civil rights jurisdiction).

1

### B. Venue

202. The Eastern District of Wisconsin is the proper venue for this action because the Defendant resides within the geographical boundaries of the Eastern District of Wisconsin within the meaning of 28 U.S.C. § 1391.

### III. PARTIES

#### A. Plaintiff

301. The Plaintiff Kima Hamilton is a citizen of the United States with the capacity to sue and be sued in this Court. He is of the black race.

#### B. Defendant

302. The Defendant Delta Air Lines, Inc., is a corporation with the capacity to sue and be sued in this Court.

### IV. ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION

401. On April 18, 2017, Mr. Kima Hamilton was a passenger on Delta Air Lines Inc. Flight 2035 from Atlanta, Georgia to Milwaukee, Wisconsin.

402. The flight was scheduled to depart at 2:55 p.m.

403. Mr. Hamilton had flown from Milwaukee, where he lives, to Atlanta, on Delta Air Lines, several days earlier (Friday, April 14, 2017) to celebrate a friend's fortieth birthday.

404. Subsequently, Mr. Hamilton drove by car to visit his mother, who lives in Leslie, Georgia.

405. His round-trip ticket scheduled him for a return trip from Atlanta to Milwaukee on Tuesday, April 18.

406. On the day Mr. Hamilton was to fly out of Atlanta, he arrived at the airport about two and one half hours prior to his flight's departure time.

407. Once on the plane and seated (in aisle seat 30-C), Mr. Hamilton struck up a conversation with a couple seated nearby, the Rosolinos.

408. Mike and Krista Rosolino are both attorneys in Milwaukee, Wisconsin, who were traveling with their young child.

409. Mr. Hamilton sat on the plane for about fifteen to twenty minutes before attempting to go the plane's lavatory.

410. Mr. Hamilton's need to urinate at that time was urgent.

411. Mr. Hamilton had heard at least one live announcement, and perhaps at least one automated announcement, directing passengers to remain in their seats, but he felt he could not obey without serious consequences.

412. From his seat, Mr. Hamilton turned right to go the nearby lavatory.

413. The restroom at the rear of the plane was only a few steps from Mr. Hamilton's seat.

414. Before Mr. Hamilton could get to the lavatory he was intercepted by a flight attendant who told him that he needed to return to his seat.

3

415. The flight attendant told Mr. Hamilton that if he used the lavatory she would have to inform the pilot and the plane would lose its place in line for departure.

416. Complying, Mr. Hamilton returned to his seat as directed.

417. By the time another seven to ten minutes had passed, Mr. Hamilton's urgent need to use the lavatory had become an emergency.

418. He then got up a second time.

419. This time he told the flight attendant that he was experiencing an emergency.

420. Appearing agitated, the flight attendant repeated that the flight would lose its place in line if Mr. Hamilton used the lavatory.

421. At this point, Mr. Hamilton had to make a literal choice between relieving himself in the lavatory or in his clothing.

422. The flight attendant appeared to gesture toward Mr. Hamilton in seeming resignation, a gesture he interpreted to mean that, while she wasn't endorsing his use of the lavatory, he could do so if he felt he had no choice.

423. Mr. Hamilton was in the lavatory for a little more than thirty seconds.

424. When he emerged, the same flight attendant he had previously encountered told him that the flight had lost its place in line.

425. The flight attendant further informed Mr. Hamilton that the pilot would need to speak with him.

4

426. Within a minute or so the pilot came on the intercom and informed the passengers that the plane would be returning to the gate so that a passenger could be removed.

427. Mr. Hamilton then turned to the Rosolinos and said that he believed the pilot was talking about him.

428. The plane returned to the gate.

429. During the return to the gate no one from Delta said anything to Mr. Hamilton.

430. Mr. Hamilton's testimony will be that his conduct did not at any time violate any of the provisions of Rule 35(f) of Delta's Contract of Carriage.

431. After the plane returned to the gate, a Delta representative, whose first name was Horatio, came to speak with Mr. Hamilton.

432. Mr. Rosolino took videos of Mr. Hamilton's interactions with the Delta representatives who came to his seat to speak with him.

433. Mr. Rosolino later posted these videos to YouTube.[1]

434. The video shows that a second Delta Air Lines employee came aboard the plane whose function clearly was to get Mr. Hamilton off the plane. [2]

435. People around Mr. Hamilton were largely verbally supportive of him as he was escorted off the plane.

---

[1] Here is a link to the first of the two videos.
https://www.youtube.com/watch?v=4MTMfblDYso
[2] Here is a link to Mr. Rosolino's video of this second interaction.
https://www.youtube.com/watch?v=7z1XH5L8Jx4

5

436. One passenger even commented to Mr. Hamilton that it was an honor to get off the plane with him.

437. The videos show that Mr. Hamilton was at all times calm, respectful, and non-threatening.

438. After the pilot's announcement that the plane would have to return to the gate, Mr. Hamilton called his wife on his cell phone to tell her what was going on.

439. The time was 2:40 p.m.

440. His wife advised him to call Delta customer service to report what he was experiencing.

441. He tried to do so, but encountered a 1.5 hour wait time.

442. Twenty-five minutes later, at 3:05 p.m., Mr. Hamilton called his wife again to tell her that he was actually being evicted from the plane.

443. During this second conversation with his wife, Mr. Hamilton observed police cars outside the plane.

444. All the passengers were deplaned and had to take their belongings off the plane. Mr. Hamilton was not the last passenger to deplane.

445. Upon exiting the plane Mr. Hamilton encountered two or three FBI agents in the jetway, along with several Delta Air Lines personnel.

446. The FBI agents asked Mr. Hamilton if they could go somewhere and talk. Atty. Mike Rosolino, who was still with Mr. Hamilton, asked whether Mr. Hamilton was under arrest. FBI Agent Malcolm Washington answered, "No."

6

447. The group then walked one gate over to talk at a gate that was not actively servicing a flight.

448. The group consisted of Mr. Hamilton, Atty. Rosolino, FBI Agent Washington, another FBI Agent, and three or four Delta employees.

449. Once at the empty gate, Mr. Hamilton explained in detail to FBI Agent Washington what had occurred.

450. Agent Washington merely listened, without interrupting, while Mr. Hamilton explained.

451. While present during this initial interview, Atty. Rosolino remained silent.

452. The group then walked to a second nearby location (one gate down and one gate over from where they had originally assembled). At the second location, Mr. Hamilton, Atty. Rosolino, and a second FBI agent were told by Agent Washington to wait until he returned.

453. About twenty minutes later Agent Washington and Horatio (the first Delta agent to speak with Mr. Hamilton on the plane) returned.

454. Agent Washington had been conducting interviews with other persons who had been on board the flight, including Delta Air Lines personnel.

455. Agent Washington related to Mr. Hamilton that he had talked with a number of persons and that he was not going to arrest him for interfering with a flight.

456. Agent Washington added that witnesses had told him that Mr. Hamilton had maintained his composure throughout the sequence of events.

457. Since no criminal charges would be initiated, Agent Washington said in conclusion, the affair was now a civil matter.

458. Mr. Hamilton interpreted this to mean that from that point forward Delta Air Lines would take control of the situation.

459. After Agent Washington left, Horatio of Delta Air Lines informed Mr. Hamilton that Delta was refusing him service and giving him a partial refund for the second half of his round trip, minus applicable fees.

460. When Mr. Hamilton asked Horatio about his checked baggage he was informed that it would be at the baggage claim in Atlanta.

461. This turned out not to be true.

462. In fact, Mr. Hamilton's checked baggage remained on the Delta flight he'd been scheduled to take.

463. Mr. Hamilton found this out when he got a telephone call from the Rosolinos, who removed his checked baggage from the baggage carousel in Milwaukee.

464. Despite never having met Mr. Hamilton until their chance encounter on the plane on April 18, the Rosolinos not only retrieved his checked baggage but took it to his home, where they left it with his wife.

465. Because Delta had refused Mr. Hamilton service, it was necessary for him to book a flight from Atlanta to Milwaukee on Southwest Airlines at a cost of $312.00. Mr. Hamilton arrived in Milwaukee later that night, at about 11 p.m.

8

466. On or about April 24, 2017, Mr. Hamilton went to the Milwaukee Airport to file a grievance about his April 18 experience.

467. He spoke with the Airport's interim site manager (who was from Texas) who told him to file his complaint online.

### A. An Open Letter of Complaint To Delta Air Lines

468. Upon her return to Milwaukee Atty. Krista Rosolino wrote an open letter to Delta Air Lines on her Facebook page. The open letter describes Delta's conduct toward Mr. Hamilton as "outrageous."

469. Delta's mistreatment of Mr. Hamilton was both outrageous and unnecessary.

### B. Local News Coverage

470. This incident received some local news coverage.[3]

### C. A Passenger of a Different Race with a Different Experience

471. Another passenger told Atty. Krista Rosolino that she had been aboard Delta Flight 0566 and witnessed a similar circumstance that Delta Air Lines handled entirely differently.

---

[3] Here is a link to the news story that appeared on Milwaukee's WISN-TV, channel 12. https://www.youtube.com/watch?v=ndzVbkEfIxY

472. A passenger was allowed to use the lavatory without the plane being returned to the gate or the passengers deplaned.

473. The story was related by passenger Alexandra Miller Lee.

474. Ms. Lee attributed the different reaction, in which a passenger was allowed to use the lavatory without the plane being returned to the gate or the passengers deplaned, to the race of the passenger.

### V. BASES OF LIABILITY

#### A. 42. U.S.C. § 1981.

501. The Defendant Delta Air Lines, Inc., would not have returned its plane to the gate, nor summoned law enforcement, nor required Mr. Hamilton to deplane, nor refused him passage to Milwaukee had everything else been the same but he had been white, so these actions violated rights to be free from racial discrimination in matters of contract conferred upon him by the Civil Rights Act of 1866, codified at 42 U.S.C. § 1981.

### VI. DAMAGES AND EQUITY

#### A. Compensatory Damages.

601. Mr. Hamilton has sustained out-of-pocket expense, emotional distress, damage to his reputation and loss of liberty as a result of the Defendant's

unlawful conduct, for which he seeks an award of compensatory damages.

### B. Punitive Damages

602. Because the Defendant's conduct evinced reckless disregard of the Plaintiff's rights, the Plaintiff also seeks punitive damages in a further amount which will serve as a deterrent to the Defendant and others who are similarly situated from repeating such behavior in the future.

## VII. CONDITIONS PRECEDENT

701. All conditions precedent to this action within the meaning of Rule 9(c), Fed. R. Civ. Pro., have been performed or have otherwise occurred.

## VIII. REQUEST FOR JURY TRIAL

801. The Plaintiff requests a trial by jury of all claims triable of right to a jury.

## IX. PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays the court to grant a judgment against the Defendant awarding the full amount of his damages together with interest, costs and attorney's fees and such other and further relief as the Court deems just.

Dated this Tuesday, December 12, 2017.

Respectfully submitted,

Kima Hamilton,

Plaintiff,

By

THE JEFF SCOTT OLSON LAW FIRM, S.C.
JEFF SCOTT OLSON
State Bar Number 1016284
131 West Wilson Street, Suite 1200
Madison, WI 53703
Phone  608/283-6001
Fax   608/283-0945
Email:  jsolson@scofflaw.com

/s/ Jeff Scott Olson

---

Jeff Scott Olson
ATTORNEY FOR PLAINTIFF