# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KIMA HAMILTON,

                Plaintiff,

v.

DELTA AIR LINES INC.,

                Defendant.

Case No. 17-CV-1725-JPS

**ORDER**

### 1.    INTRODUCTION

Plaintiff, an African American, claims that Defendant removed him from one of its flights due to his race. (Docket #1). On June 1, 2018, Defendant filed a motion for summary judgment, contending that Plaintiff was removed for his disruptive behavior, not because of his skin color. *See generally* (Docket #17 and #18). Plaintiff responded to the motion on July 2, 2018, (Docket #30), and Defendant replied on July 16, 2018, (Docket #31). For the reasons explained below, Defendant's motion must be granted.

### 2.    STANDARD OF REVIEW

Federal Rule of Civil Procedure ("FRCP") 56 provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d

356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

3.   **RELEVANT FACTS**

The following facts are material to the Court's disposition.[1] Plaintiff, a black man and a resident of Milwaukee, bought a ticket for Defendant's April 18, 2017 flight from Atlanta to Milwaukee. Also on the flight were Michael and Krista Rosolino ("Michael" and "Krista," respectively, and the "Rosolinos" collectively), both of whom are lawyers living in Milwaukee. Plaintiff and the Rosolinos were seated near each other, and engaged in friendly interaction while they waited for the plane to depart from the gate.

During this time, Plaintiff and several passengers near him were using their cell phones. Kathryn Smith ("Smith"), a flight attendant, singled out Plaintiff, telling him that he needed to put his phone away immediately. The Rosolinos were concerned by Smith's "unkindly" tone towards Plaintiff. Michael also noticed that the other cell phone using passengers whom Smith did not chastise were white men.

The plane eventually left the gate and waited on the tarmac for its turn to move onto the runway. The fasten-seatbelt sign was active and passengers had been instructed not to leave their seats. Unfortunately, Plaintiff felt a strong urge to use the bathroom. Plaintiff heard the pilot, Captain Yuri Rodin ("Rodin"), announce that the place was third in line for

---

[1] The facts are drawn from the parties' factual briefing, (Docket #29 and #32), unless otherwise noted.

takeoff, so he believed he had an opportunity to go.[2] Plaintiff went to the rear of the plane where he encountered Smith again. He asked for permission to use the bathroom. Smith responded that if he did, the plane would lose its spot in line for takeoff. She told Plaintiff to return to his seat and, in accordance with Defendant's policies and FAA regulations, immediately called Rodin to let him know that a passenger was not seated.

Plaintiff decided he would try to wait it out and returned to his seat. After some time elapsed, between ten and thirty minutes, Plaintiff's need to use the bathroom became an emergency. When he could wait no longer, Plaintiff got up again and returned to the rear bathroom. Plaintiff again met Smith and asked for permission to use the bathroom. She repeated that the plane would lose its place in line and that Plaintiff needed to take his seat. Plaintiff responded that it was an emergency. Plaintiff says Smith appeared aggravated at this and gestured toward the bathroom door. He took this as her approval and so used the bathroom. He was in and out in less than a minute.

When Plaintiff emerged, Smith reminded Plaintiff that they would now lose their place in line because of him. Plaintiff apologized, reiterating that it had been an emergency. While Plaintiff was inside, Smith had called Rodin again to report what had happened. She said that Plaintiff had or was having an emergency and that he was not complying with her instructions. Rodin was unsure of what the emergency was, as Smith did not explain. She now claims to not know what Plaintiff's emergency was.

---

[2]The parties dispute where the plane was at various times, what place it had in the takeoff line, and whether it was moving. For the purposes of this Order, the Court must adopt Plaintiff's version of events. In the end, it matters little.

While the plane was maneuvering towards the runway, Michael saw a number of other passengers get up to retrieve items from the overhead bin. Those passengers did so and sat back down without a reaction from the flight crew, though like Plaintiff those passengers were violating the fasten-seatbelt order. Michael does not identify the race of those passengers. Further, neither Plaintiff nor the Rosolinos saw any other passengers attempt to use the bathroom around the time Plaintiff did.

After the bathroom incident, there was an announcement that the plane would be returning to the gate and a passenger would be removed. Once back at the gate, two different employees of Defendant came to speak with Plaintiff and asked him to leave the plane. Plaintiff refused each time, demanding an explanation as to why this was happening. After the second employee left, all passengers were directed to leave the plane. Some of those near Plaintiff discussed refusing to leave to show solidarity with him. Plaintiff advised them against this and everyone exited the plane.

When he left the aircraft, Plaintiff was immediately confronted by FBI agents. Plaintiff, Michael (he offered to briefly represent Plaintiff), and the agents went to another area of the terminal to speak. Plaintiff calmly told the agents his version of events. Michael observed that the agents seemed ready for Plaintiff to be violent or angry. Indeed, the agents said that they believed Plaintiff had been angry and combative on the plane.[3] This information could only have come from Defendant's employees, most

---

[3]Michael testified to this interaction at his deposition. Defendant now objects to the hearsay nature of the statement. The testimony is not hearsay. Defendant seems to forget that Michael was standing right there as the agents spoke; this was not something that Plaintiff later communicated to Michael. It is also not being used to prove whether what the agents said to Plaintiff was true, only that they made the statements.

likely Smith herself. The agents briefly interviewed some other passengers, then told Plaintiff he was free to go. Plaintiff was not charged with any crimes. The agents left Plaintiff with the instruction that it was up to him to speak with Defendant's representatives about being allowed back on the flight. Plaintiff and Michael parted ways after the agents left. Michael was allowed to return to the plane and rejoin his family, but Defendant refused to fly Plaintiff to Milwaukee and refunded part of his fare.

Rodin, not Smith, made the decision to return to the gate and remove Plaintiff from the plane. Plaintiff concedes that Rodin was not personally motivated to remove him from the plane by reason of his race. Instead, Rodin's decision was based on what he was told by Smith and what he knew from his position as the plane's pilot. From that position, Rodin did not know Plaintiff's race, but did know that he had disrupted the takeoff process, disobeyed flight crew instructions, and had ignored the fasten-seatbelt order, all in contravention of Defendant's policies and its contract of carriage. Plaintiff asserts that some of these beliefs were erroneous based on lies or manipulations orchestrated by Smith.

Plaintiff also admits that he has no direct evidence that Defendant or its employees were purposefully discriminating against him because of his race. However, he and the Rosolinos still believe that he was treated badly by Defendant, and differently from other passengers, on that basis. Toward that end, Plaintiff sought records of similar incidents involving non-black passengers from Defendant in discovery. Defendant does not track removals of passengers from flights by race, so there is no statistical support for Plaintiff's view to be found in Defendant's own records.

Plaintiff's theory of the case is that that Smith bore racial bias, and that this permeated the events of that day, leading to his ejectment. Plaintiff

likely Smith herself. The agents briefly interviewed some other passengers, then told Plaintiff he was free to go. Plaintiff was not charged with any crimes. The agents left Plaintiff with the instruction that it was up to him to speak with Defendant's representatives about being allowed back on the flight. Plaintiff and Michael parted ways after the agents left. Michael was allowed to return to the plane and rejoin his family, but Defendant refused to fly Plaintiff to Milwaukee and refunded part of his fare.

Rodin, not Smith, made the decision to return to the gate and remove Plaintiff from the plane. Plaintiff concedes that Rodin was not personally motivated to remove him from the plane by reason of his race. Instead, Rodin's decision was based on what he was told by Smith and what he knew from his position as the plane's pilot. From that position, Rodin did not know Plaintiff's race, but did know that he had disrupted the takeoff process, disobeyed flight crew instructions, and had ignored the fasten-seatbelt order, all in contravention of Defendant's policies and its contract of carriage. Plaintiff asserts that some of these beliefs were erroneous based on lies or manipulations orchestrated by Smith.

Plaintiff also admits that he has no direct evidence that Defendant or its employees were purposefully discriminating against him because of his race. However, he and the Rosolinos still believe that he was treated badly by Defendant, and differently from other passengers, on that basis. Toward that end, Plaintiff sought records of similar incidents involving non-black passengers from Defendant in discovery. Defendant does not track removals of passengers from flights by race, so there is no statistical support for Plaintiff's view to be found in Defendant's own records.

Plaintiff's theory of the case is that that Smith bore racial bias, and that this permeated the events of that day, leading to his ejectment. Plaintiff

says her prejudice is evident in Rodin's decision to remove him and can also be inferred from misstatements and misinformation found in other records. For instance, the FBI agents prepared a report about the incident. The report stated that Plaintiff had used the bathroom twice, but this was false. Smith denies speaking with the FBI, but Plaintiff posits that they would have no other source for this information.

Smith herself wrote a report which included a narrative discussion of the incident:

> Capt. announces we are number 3 for take off and all FAs take our seats. about 8 minutes later we are about to take off and passenger in row 30C runs towards my aft jumpseat and grabs the strap with raised voice continues to announce that "its an emergency, its an emergency!" while grabbing the lav handle. I tell him he needs to return to his seat immediately, several times, that we are about to take off that he can not be standing that I need to call the Capt. I grab the phone and he continues to tell me he NEEDS to use the lav and I tell him we will have to circle around if he stays standing and as soon as the capt picks up the phone the pax says "then just forget about it!" and returns to his seat. I convey to the capt what has just happened and the aircraft comes to a halt. After about 10 minutes of waiting on the taxi way the same pax returns to the tail come and announces "this is what I was trying to avoid the first time!" and continues to say this is an emergency while grabbing the barrier strap. I repeat that I need to call the pilot and allow him to undo the strap and use the lav. As soon I inform the pilot what has happened he informed me that we would be heading back to the gate. the pax comes out of the lav less then 1 minute later and I inform him that we are most likely heading back to the gate and that someone will most likely be meeting us to talk about what has just happened. he says that he would like to talk to the pilot in an aggravated tone.

*Id.* at 2. Plaintiff says that a number of statements in the narrative are false, primarily on how combative and confrontational he actually was, versus how Smith's narrative portrays him to be.

Plaintiff attempts to offer further examples of differential race-based treatment, beyond what occurred in the plane itself, but he stumbles on evidentiary and procedural issues. While waiting to re-board their plane, Krista spoke with a passenger of one of Defendant's other flights. The passenger stated that a white person had used the bathroom on their flight in a similar manner as Plaintiff, but that the person was not removed from that flight. The flight attendant on that plane informed the pilot about the issue, who stopped the plane, and resumed traveling when the person had returned to their seat. This anecdote is, of course, inadmissible hearsay. Fed. R. Evid. 801(c)(1)–(2).

Krista further claims that she has flown many times in her life and has never seen a passenger removed from a plane for conduct like Plaintiff's. Plaintiff's proposed finding of fact on this point does not cite to any evidence. (Docket #32 ¶ 86). Even if it did, Krista's statement has no bearing on racial discrimination. Finally, Plaintiff offers the affidavit testimony of Gary Meringer ("Meringer"), a white male, who avers that he acted similarly to Plaintiff multiple times on Defendant's flights in the past few years, without being ejected from the plane. Plaintiff did not disclose Meringer as a potential witness as required by FRCP 26(a)(1)(A)(i). FRCP 37(c)(1) mandates that the Court cannot consider his testimony in deciding the instant motion.

4. **ANALYSIS**

Plaintiff proceeds on a single claim. He alleges that Defendant violated his rights under the Civil Rights Act of 1866, 42 U.S.C. § 1981(a),

by discriminating against him on the basis of his race in a matter of contract. (Docket #1 at 10). Section 1981 prohibits racial discrimination in making and enforcing private contracts. *Petrovic v. Enter. Leasing Co. of Chi., LLC*, 513 F. App'x 609, 610 (7th Cir. 2013). To succeed on his claim, Plaintiff must establish that: 1) he is a member of a racial minority, 2) Defendant intended to discriminate against him on the basis of race, and 3) Defendant's discrimination interfered with his rights under Section 1981. *Black Agents & Brokers Agency, Inc. v. Near N. Ins. Brokerage, Inc.*, 409 F.3d 833, 837 (7th Cir. 2005). The first element is incontestable, and the third is undisputed; Defendant concedes that its contract of carriage is a contract subject to Section 1981's protections. (Docket #18 at 7 n.1). Whether Defendant's actions were motivated by racial bias is the only matter in dispute.

Most Section 1981 claims arise in the employment context, so the case law is somewhat difficult to apply to Plaintiff's scenario. Nevertheless, certain general instructions remain apposite. In evaluating the propriety of summary judgment in any discrimination case, courts must focus on one question: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [negative action or consequence]." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Despite this clear command, post-*Ortiz* decisions note that "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018). Thus, courts may still refer to the *McDonnell Douglas* factors to assist in answering the *Ortiz* question. As relevant here, those factors include whether Plaintiff was meeting Defendant's legitimate expectations, whether Defendant subjected

Plaintiff to unfavorable treatment despite meeting those expectations, and whether similarly situated non-black persons were treated more favorably than Plaintiff. *Id.* at 895.

Plaintiff has failed to adduce sufficient admissible evidence to take his Section 1981 claim to a jury. This decision has two interrelated bases. First, Plaintiff admits that he has no direct evidence of discrimination. Plaintiff does not even allege, much less offer evidence, that Smith, Rodin, or any of Defendant's other employees stated or implied that their treatment of him had anything to do with his race. Neither Plaintiff nor his fellow passengers claim to have heard a racial epithet or racially charged comment during the entire incident.

Second, Plaintiff's indirect evidence of discrimination—the various implications of Smith's bias—is not adequately juxtaposed against evidence of better treatment for non-black passengers. Unfortunately, most of Plaintiff's evidence of differential treatment is irrelevant, inadmissible, or not presented in accordance with the rules of procedure. Krista's account of another passenger's experience on a different one of Defendant's flights is classic hearsay. Plaintiff failed to cite any evidence to present Krista's assertion that she has flown a lot and has had never seen anyone treated like Plaintiff before. The claimed fact could be ignored on that basis. Fed. R. Civ. P. 56(e)(2)–(3). Nevertheless, the Court generously searched for support for the assertion in Krista's deposition. (Docket #20-2 at 22:13-24:3). Even with an appropriate citation, Krista's observation has nothing to do with race. She does not say that she has seen other non-black passengers treated more favorably than Plaintiff was in using the bathroom while on the tarmac. Further, the Court cannot consider Meringer's affidavit because he was not properly disclosed in discovery. Finally, Plaintiff chides

Defendant for being unable to cite a single instance where a white passenger was forced off of a flight under the same circumstances. However, Defendant's lack of such records is not nefarious. It is merely a product of Defendant's recordkeeping procedures, which do not note the race of passengers who are removed from flights.

Plaintiff's only admissible and potentially relevant evidence of disparate treatment comes from what happened on the plane. As noted above, Plaintiff says he was singled out for enforcement of the cell phone usage ban while white passengers' transgressions were ignored. He further asserts that other passengers stood up and rummaged in the overhead bins around the time of his bathroom trips, without being accosted by the flight crew. While the Court does not know the race of those passengers, it will charitably infer that they were not black. Even if both of these observations are correct, Plaintiff's claim is not for being prohibited from using his cell phone or going to the bathroom. Rather, he contends (as Section 1981 requires) that Defendant's interference with his *contract to fly* was racially motivated. Plaintiff acknowledges as much in his pleading, stating that his rights were violated by Defendant "return[ing] its plane to the gate, . . . summon[ing] law enforcement, . . . requir[ing] Mr. Hamilton to deplane, [and] refus[ing] him passage to Milwaukee," omitting any reference to the cell phone or bathroom issues. (Docket #1 at 10). The focus, then, must be on Rodin's decision to remove him and the subsequent refusal to allow Plaintiff back onto the flight.

With this in mind, Plaintiff cannot show that the other passengers are similarly situated to him. To be similarly situated, Plaintiff and the comparator must be "directly comparable . . . in all material respects." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018) (quotation

omitted). Plaintiff admits that he alone went to the bathroom, was told to return to his seat, but got up again a few minutes later without regard for that command. Plaintiff offers no evidence that the passengers who used their cell phones or who checked the overhead bins did so against the direct instruction of a flight attendant. This material and readily apparent difference between Plaintiff and the proposed comparators makes them dissimilar.

Without direct evidence of discrimination, Plaintiff needed to show that Defendant's treatment of him was different from the way it treated comparable non-black passengers. He has no evidence upon which a reasonable jury could make such a finding. In the language of *Ortiz*, no reasonable factfinder could conclude that race is what motivated Smith, Rodin, or any of Defendant's other employees' actions.[4]

5.  **CONCLUSION**

Plaintiff's treatment by Defendant on April 18, 2017 was unfortunate and blown far out of proportion to his transgression—using the bathroom to avoid soiling himself. The Court's decision in no way endorses or condones Defendant's conduct. Nevertheless, Plaintiff has not offered evidence which suggests that Defendant should bear liability for racial

---

[4] As discussed above, Plaintiff stresses that Smith was the source of the racial bias that day and used Rodin as the "cat's paw." (Docket #30 at 9–17); *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017). Because Plaintiff has not adduced evidence of an appropriate comparator, the Court need not decide whether his theory is correct. Still, even taking all of Plaintiff's evidence as true, it appears that he has merely shown that Smith is a mean and vindictive person, not that her actions were driven by racial animus. *Milligan-Grimstad*, 877 F.3d at 711 ("To survive summary judgment on [a cat's paw] theory, the plaintiff must provide evidence that the biased subordinate *actually harbored discriminatory animus against the victim* . . ., and evidence that the biased subordinate's scheme was the proximate cause of the adverse . . . action.") (emphasis added).

discrimination. The Court must, therefore, grant Defendant's motion for summary judgment and dismiss this action with prejudice.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Docket #17) be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of July, 2018.

BY THE COURT:

_____
J. P. Stadtmueller
U.S. District Judge